IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | |
|---|---|
| Kelly Shaw-Lapan, Individually and as Personal Representative of the Estate of Stephen W. Lapan,<br><br>     Plaintiff,<br><br>vs.<br><br>The United States of America,<br><br>     Defendant. | 1:25-cv-11196-SAL<br><br>**COMPLAINT** |

Plaintiff Kelly Shaw-Lapan, Individually and as Personal Representative of the Estate of Stephen W. Lapan, by and through her undersigned counsel, complaining of the Defendant, alleges as follows:

**JURISDICTIONAL ALLEGATIONS**

1. Plaintiff Kelly Shaw-Lapan (hereinafter, "Plaintiff" or "Mrs. Lapan") is the duly appointed Personal Representative of the Estate of her late husband, Stephen W. Lapan (hereinafter, "Decedent" or "Mr. Lapan"), having been appointed by the Aiken County Probate Court on December 18, 2024 (Case Number 2024-ES-02-1284).

2. Plaintiff brings this action against the United States of America (hereinafter, "Defendant" or "United States") for injuries and damages Plaintiff and Decedent sustained as a result of the negligence, recklessness, and/or gross negligence of the United States and its employees, servants, and/or agents.

3. At all times relevant to this Complaint, Plaintiff and Decedent were citizens and residents of Aiken County, South Carolina.

4. Plaintiff brings this Complaint against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* and 28 U.S.C. § 1346(b)(1) for money damages as compensation for the injuries and death of Stephen W. Lapan, which were caused by the acts and/or omissions of employees, servants, and/or agents of the United States Government, working at different Veterans Administration medical facilities, including the Aiken VA Clinic in Aiken, South Carolina and the VA Augusta Healthcare System in Augusta, Georgia.

5. Plaintiff also brings a cause of action against the United States for loss of consortium arising out of the injuries and damages alleged herein.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because Plaintiff resides in this judicial district.

7. Plaintiff has fully complied with the provisions of 28 U.S.C. § 2675 of the Federal Tort Claims Act by giving formal notice in writing to the United States through the filing of a Form 95 with the Department of Veterans Affairs. Following the filing of the Form 95, on April 1, 2025, Plaintiff was interviewed by Reshawna Banks of the Department of Veterans Affairs who was investigating the claims asserted. However, despite this interview and Plaintiff's counsel following up with the VA's Office of General Counsel regarding the status of the VA's investigation, Plaintiff has received neither an official denial nor a resolution of her claims. Accordingly, because six months have elapsed since the Form 95 was filed, Plaintiff is filing this Complaint in compliance with 28 U.S.C. § 2675(a).

## FACTUAL ALLEGATIONS

8. Stephen Lapan was a Navy veteran and former employee of the Department of Veterans Affairs.

9. He came under the medical care of the VA in approximately 1999.

10. On November 9, 2022, Mr. Lapan was seen by his primary care physician at the VA, Dr. Sylva Al-Soudi, for a wellness check.

11. Dr. Al-Soudi ordered a low-dose CT scan for lung cancer screening.

12. Mr. Lapan's VA medical chart indicates that the CT scan was approved on November 9, 2022 by Dr. Ajo John, who, upon information and belief, is a health care provider with the VA.

13. Thereafter, the VA scheduled the low-dose CT scan to be performed at an outside, non-VA, community care provider, Aiken Regional Medical Centers (hereinafter, "Aiken Regional").

14. On January 4, 2023, the appointment was scheduled by the VA for the CT scan to be performed on January 12, 2023.

15. Mr. Lapan complied with his VA physician's recommendation, and the low-dose CT scan was performed as scheduled at Aiken Regional on January 12, 2023.

16. The CT scan revealed a 3 cm spiculated mass in the peripheral left lower lobe, and the interpreting radiologist specifically noted that the findings were "suspicious for malignancy." Further radiology studies and a biopsy were recommended.

17. The results of the low-dose CT scan were very serious and required immediate follow-up.

18. Upon information and belief, Mr. Lapan's lung cancer had not metastasized at the time of the January 12, 2023 low-dose CT scan.

19. The notes contained in Mr. Lapan's VA medical record indicate that the VA was aware that the low-dose CT scan had been performed as scheduled on January 12, 2023.

20. However, the VA negligently failed to conduct the proper follow-up to obtain the results of the CT scan.

21. The VA assured Mr. Lapan had there been an abnormal finding on the low-dose CT scan, they would have been prompted contacted and that he had nothing to worry about.

22. On January 26, 2023, Fanta Freeman, an employee of the VA, made a note in Mr. Lapan's file that the VA made a first attempt to obtain the records from the CT scan performed at Aiken Regional. This note was entered at 12:45 on January 26, 2023:

```
ADDED COMMENT          01/26/23 12:45        FREEMAN,FANTA        FREEMAN,FANTA
R1-First attempt to get records from community care
COT-CC appointment has occurred, waiting for records: Per Provider
CUR-CTB User Role: Scheduler
COM-Additional Comments:
Per scheduler Ms.Ashley confirms veteran attended scheduled appt . Request
for records
COM---------
```

23. Inexplicably, two minutes later, at 12:47 on January 26, 2023, the same VA employee, Fanta Freeman, made a notation that the request for records was being administratively closed without the VA receiving the records:

```
COMPLETE/UPDATE        01/26/23 12:47        FREEMAN,FANTA        FREEMAN,FANTA
ACN-Administratively closed without records
   Administratively complete without records follow-up (low-risk consult):
Low Risk Consult - Facility community care staff have received
confirmation that the Veteran has attended the initial visit. One attempt
has been made to obtain medical records without timely response from the
community provider. This consult is being administratively completed per
the guidance in the Office of Community Care Field Guidebook.
CUR-CTB User Role: Scheduler
```

24. On July 8, 2024, Dr. Audrey M. Hodge, Chief of Staff, entered an Institutional Disclosure of Adverse Event note into Mr. Lapan's VA medical record.

25. An Institutional Disclosure of Adverse Event is a formal process required under the Department of Veterans Affairs' national policy (VHA Directive 1004.08) when a patient

experiences a serious adverse event related to their care that results in or is reasonably expected to result in death or serious harm.

26. Under this directive, VA medical facilities are obligated to provide patients or their representatives with a transparent, timely, and compassionate disclosure of the event, including an explanation of what occurred, its clinical implications, and steps being taken to address it.

27. Institutional disclosures are typically conducted by senior clinical staff and are documented in the patient's medical record.

28. As set forth in the Institutional Disclosure of Adverse Event Note and during the associated meeting held with Mr. Lapan and his family, Dr. Hodge admitted that the VA made one attempt to obtain the results of the January 12, 2023 low-dose CT scan and then closed the request without obtaining the radiology report.

29. The VA had a duty to provide medical care to Mr. Lapan consistent with the applicable standard of care.

30. This duty included ensuring that diagnostic test results were timely obtained from Aiken Regional and communicated to Mr. Lapan to allow for prompt and life-saving care.

31. The CT scan revealed findings consistent with lung cancer, a serious and life-threatening condition that required immediate medical intervention.

32. Following the January 12, 2023 low-dose CT scan that revealed the presence of lung cancer, Mr. Lapan continued to receive treatment from various providers at the VA.

33. Despite this, neither Mr. Lapan's primary care physician at the VA nor any of his other VA medical care providers took steps to obtain the radiology report, to ascertain the findings of the low-dose CT scan, to communicate such findings to Mr. Lapan, or to schedule appropriate care.

34. For example, Mr. Lapan was seen at the VA multiple times in 2023, including on May 15, 2023 and August 15, 2023, for pain management visits for his cervicalgia and low back pain, both of which were chronic conditions.

35. His VA providers failed to follow up on the results of the low-dose CT scan or to discover that the VA had failed to seek out, obtain, or communicate to Mr. Lapan the results of this critical radiology study.

36. On November 21, 2023, Mr. Lapan reported to the Augusta VA for a general health examination and was seen by Martin A. Rapp, FNP.

37. During his evaluation of Mr. Lapan and review of his past medical history, medications, etc., Nurse Practitioner Rapp failed to follow up on the results of the low-dose CT scan that had been performed approximately nine months prior or to discover that the VA had apparently never appropriately sought or obtained a copy of the radiology study.

38. On May 21, 2024, over sixteen months after the low-dose CT scan revealed the presence of the cancerous lung mass, Mr. Lapan went to the Aiken VA Clinic for lab work and was found to be short of breath and wheezing.

39. EMS was called, and Mr. Lapan was emergently transported to Aiken Regional.

40. At Aiken Regional, a chest x-ray and CT angiogram of the chest were performed.

41. Kristian Thomas, PA-C, reviewed Mr. Lapan's chart and noted the January 12, 2023 low-dose CT scan, which showed a spiculated mass in the left lower lobe.

42. The Aiken Regional History and Physical states: "Unfortunately, patient was never made aware of these results. He states that his impression was that his PCP never received the results of the screening in order to share it with him."

43. Prior to being informed of the results of the low-dose CT scan for the first time on May 21, 2024, the VA repeatedly assured Mr. Lapan had there been an abnormal CT finding, they would have been prompted contacted and that there was no cause for concern. Also, importantly, Mr. Lapan was told there was nothing further for him to do related to the January 12, 2023 CT scan.

44. On May 21, 2024 at Aiken Regional, another CT scan of the chest was performed, which showed a spiculated nodule in the posterior left apex. Mr. Lapan's left lower lobe was also collapsed.

45. An MRI of the brain performed on May 23, 2024 revealed numerous lesions in the brain consistent with widespread metastatic disease.

46. Dr. Aaron Flanders, an oncologist at Aiken Regional, consulted regarding Mr. Lapan's case.

47. Dr. Flanders discussed the imaging results with Mr. Lapan and his family and explained that Mr. Lapan very likely had metastatic non-small cell lung cancer.

48. Dr. Flanders' consultation report noted that Mr. Lapan needed a tissue diagnosis as well as a PET scan and biopsy.

49. Even after the grossly negligent conduct of the VA leading to an over sixteen-month delay in the diagnosis of Mr. Lapan's lung cancer, the VA continued to fail Mr. Lapan and cause further injuries.

50. An order for a biopsy to confirm the lung cancer diagnosis was made, but the VA denied the request.

51. Specifically, Mr. Lapan's providers at Aiken Regional made a request to the VA for Mr. Lapan to have a CT-guided adrenal biopsy.

7

52.     According to Aiken Regional's medical records, "CT-guided adrenal biopsy was requested and the VA has denied this to be done at any center outside the VA. The VA has also declined to schedule this. It is imperative that he have a tissue diagnosis so that treatment planning can be undertaken."

53.     As a result of the VA's refusal to schedule or otherwise arrange for a tissue biopsy to be performed, critical treatment was further delayed.

54.     On June 7, 2024, an order was written for Mr. Lapan to undergo a PET scan at Augusta University.

55.     A PET scan was ordered to be performed at Augusta University because, according to VA pulmonologist Dr. Joseph John, "our machine is broken."

56.     Additional notations in Mr. Lapan's medical chart indicate that the VA's PET scan machine was "unavailable until August."

57.     On June 24, 2024, VA pulmonologist Dr. John saw Mr. Lapan for a pulmonary consult.

58.     Dr. John went through Mr. Lapan's history and reviewed medical records and scans provided by Mr. Lapan and his family.

59.     Dr. John noted that Mr. Lapan's family had obtained and brought to the appointment a CD containing the January 12, 2023 CT scan showing the 3 cm left lower lobe mass, but that Dr. John had also discovered that even as of the date of Mr. Lapan's appointment, the VA had still failed to upload the radiology study and results into Mr. Lapan's file.

60.     Dr. John's note states, "I hope that gets uploaded into Vista at this time" and "[a]s of now what we have in Vista is a chest radiograph from 2005."

61. The plan was made for Mr. Lapan's son to bring the CD of the PET scan to the VA to be sent to interventional radiology, "hoping that it will facilitate the adrenal procedure, and if needed, CT-guided lung biopsy procedure."

62. On July 4, 2024, Mr. Lapan presented to Aiken Regional via EMS with hypoxia and respiratory failure.

63. Mr. Lapan's respiratory failure was caused by the progression of his lung cancer and exacerbated by the VA's failure to provide him with a nebulizer that had been previously ordered by his physician.

64. On September 10, 2024, Mr. Lapan was scheduled for a chemotherapy treatment, but it was discovered that his PICC line was obstructed.

65. His wife, Plaintiff Kelly Shaw-Lapan, was instructed to drive Mr. Lapan from Aiken to Augusta Vascular Center in Augusta, Georgia, which she promptly did.

66. Mr. and Mrs. Lapan's daughter, Jocelyn Lapan, accompanied her parents to Augusta.

67. In Augusta, Mr. Lapan's PICC line was exchanged to remedy the obstruction.

68. Once that procedure was complete, Plaintiff and Jocelyn Lapan got Mr. Lapan back into their car to drive him back to Aiken to receive his chemotherapy treatment.

69. En route from Augusta to Aiken, Mr. Lapan became unresponsive, and Plaintiff, recognizing the dire situation, rushed her husband to Aiken Regional, where they were met outside by medical staff.

70. Mr. Lapan tragically passed away in the car ride with his wife and daughter on the way to his final chemotherapy appointment.

71. He was 73 years old.

72. The VA owed duties of care to Mr. Lapan, which included, among others, obtaining and timely communicating diagnostic test results to ensure proper follow-up and treatment.

73. The VA breached its duty of care by failing to promptly obtain and review the results of the low-dose CT scan, to communicate the findings to Mr. Lapan in a timely manner, and to ensure appropriate follow-up testing and care.

74. As a direct and proximate result of these breaches, Mr. Lapan's lung cancer went undiagnosed and untreated during the critical period when it was localized and potentially curable.

75. Upon information and belief, Mr. Lapan's cancer metastasized during the delay between the January 12, 2023 CT scan and May 21, 2024 as well as during the subsequent delay in offering Mr. Lapan treatment.

76. As a result of the VA's failure to provide timely notice of the January 12, 2023 CT scan results and lack of urgency to treat him thereafter, Mr. Lapan was deprived of the opportunity for timely and potentially life-saving treatment.

77. The delay allowed the cancer to metastasize and spread, significantly worsening Mr. Lapan's prognosis and reducing available treatment options and the effectiveness of those options, ultimately resulting in Mr. Lapan's death.

78. The injuries, suffering, and death of Mr. Lapan were the direct and proximate result of and were caused and occasioned by the negligence, carelessness, recklessness, willfulness, and wantonness on the part of the United States and its agents, employees, and servants in failing to possess and exercise that degree of medical training, competency, and skill ordinarily and customarily possessed and exercised by medical professionals in similar circumstances. Attached as **Exhibit 1** is the Affidavit of Dr. Carol A. Rupe, who will testify as to one or more deviations from the applicable standard of care.

## FOR A FIRST CAUSE OF ACTION
### (WRONGFUL DEATH)

79. Plaintiff reiterates paragraphs 1 – 78 above as if set forth verbatim herein.

80. The Defendant United States of America, through its agents, servants, and/or employees, undertook the duty to render medical care to Mr. Lapan in accordance with the prevailing and acceptable professional standards of care in the national community.

81. Notwithstanding said undertaking and while Mr. Lapan was under the care of agents, servants, and/or employees of the Defendant United States of America, Defendant departed from prevailing and acceptable professional standards of care and treatment of Mr. Lapan and was negligent, careless, grossly negligent, reckless, and in violation of the duties owed to Mr. Lapan. As such, the United States is liable for one or more of the following acts of omission or commission, any or all of which are departures from the prevailing and acceptable professional standards of care:

    a. In failing to timely and appropriately follow up on the results of radiology studies performed, including the low-dose CT scan ordered and scheduled by the VA and performed at a community care provider, Aiken Regional, on January 12, 2023;

    b. In improperly closing out the request to obtain the results of the January 12, 2023 low-dose CT scan without obtaining the results, images, or records;

    c. In failing to review the results of the January 12, 2023 low-dose CT scan;

    d. In failing to communicate critical imaging findings and other test results in a timely manner;

    e. In failing to make necessary referrals in a timely manner;

    f. In failing to follow up on the results of the January 12, 2023 low-dose CT scan at various times between January 12, 2023 and May 21, 2024, during which time Mr.

        Lapan was seen on multiple occasions at the VA by various VA healthcare providers;

g. In allowing sixteen months to elapse and Mr. Lapan's cancer to progress and metastasize without providing him notice and the opportunity to begin treatment;

h. Following Mr. Lapan's delayed diagnosis of cancer on May 21, 2024, in failing to timely and appropriately order, schedule, and/or approve further necessary testing and treatment or otherwise treat him with the level of urgency that his condition required; and

a. In such other ways as may be identified through discovery.

82. As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, and departures from the professional standards of care by Defendant and its agents, servants, and/or employees, Stephen W. Lapan suffered from severe debilitating injuries and an untimely and wrongful death.  The Defendant and its agents, servants, and/or employees caused Plaintiff and Decedent's beneficiaries to lose his support, aid, society, comfort, and companionship.  Plaintiff, as Decedent's Personal Representative, is therefore entitled to recover from Defendant a sum of money to compensate the heirs at law for all damages allowable under law for the wrongful death action.  All damages should be in an amount determined by a judge at trial.

**FOR A SECOND CAUSE OF ACTION**
**(SURVIVAL)**

83. Plaintiff reiterates paragraphs 1 – 82 as if set forth verbatim herein.

84. As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, and departure from professional standards of care by Defendant and its agents, servants, and/or employees as set forth herein, Mr. Lapan suffered from severe debilitating injuries

which caused him conscious pain and suffering while alive, caused his Estate to incur medical bills, and caused expenses associated with his funeral. Plaintiff, as Personal Representative of Mr. Lapan's Estate, is entitled to recover from Defendant a sum of money to compensate his Estate for all damages allowable under the survival action. All damages should be in an amount determined by a judge at trial.

## FOR A THIRD CAUSE OF ACTION
### (LOSS OF CONSORTIUM)

85.     Plaintiff reiterates paragraphs 1 – 84 above as if set forth verbatim herein.

86.     As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, and departures from professional standards of care as set forth herein, Plaintiff, as the wife of Mr. Lapan, suffered a loss of consortium. She is therefore entitled to an award of damages to compensate her for the loss of her husband's society, comfort, companionship, and support. She is entitled to an award of actual and consequential damages in an amount to be determine by a judge at trial.

WHEREFORE, Plaintiff respectfully prays for judgment against the Defendant for actual damages, special damages, and consequential damages in an amount to be determined by the judge at the trial of this action, for the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

MCGOWAN, HOOD, FELDER & PHILLIPS, LLC

By: s/TIMOTHY M. MCKISSOCK
    Timothy M. McKissock
    Federal Bar No.: 6257
    Erin R. Stuckey
    Federal Bar No.: 9868
    1517 Hampton Street
    Columbia, South Carolina 29201
    (803) 779-0100
    tmckissock@mcgowanhood.com
    estuckey@mcgowanhood.com

*Attorneys for Plaintiff Kelly Shaw-Lapan, Individually and as Personal Representative of the Estate of Stephen Lapan*

Columbia, South Carolina
August 18, 2025